Those who have not argued here before, we have this lighting system, and you'll notice when that yellow light comes on, it means you have two minutes to complete your argument. And when the red light comes on, we expect you to end your argument at about that point. These cases are being recorded for the purposes of assisting us in writing any opinions that come out of the proceedings today. And if you get away from that microphone, we lose your voice. So you want to stay right behind the podium. Some lawyers like to kind of roam around when they're making arguments, but it's important to stay behind the podium when you're making your argument here. The other point I would make to you is that rebuttal is for rebuttal only, and we don't expect you to bring up any new arguments in rebuttal that have not previously been addressed either by you or your opponent. So that, we call the first case of the day, and that is T-Mobile v. National Labor Relations Board, and so on. And Mr. Salvatore, we'll hear from you, representing T-Mobile. Good morning, Your Honors. May it please the Court, my name is Paul Salvatore from Proskauer Rose for T-Mobile. I'm reserving five minutes for rebuttal. The NLRB admits that none of T-Mobile's four common-sense workplace policies were promulgated in response to union activity or applied to restrict Section 7 rights. The question here is a hypothetical one. Would an employee reasonably construe the policies to prohibit Section 7 activity? The answer is absolutely not. But what the Board has done to erroneously answer that question— How do we know what a reasonable person is? That's, I mean, it depends on what the constituency of the Board is at a particular time and who appointed them. Absolutely, Judge Jolly. Were they management-oriented or were they union-oriented? Absolutely, Judge Jolly. When you look at the Board's jurisprudence in this area under Lutheran heritage, you'll see that it flip-flops all over the place. It draws hair-splitting distinctions that are impossible for employers to follow. The acting chair of the NLRB, Philip Mescamero, in the William Beaumont case, which is cited by the Board in his dissent, has laid out all the reasons why the Lutheran heritage standard should either be revisited by the Board or repudiated by the circuits. And what the Board did here, Your Honor, is substitute— Well, exactly, that was the point I was just about to make, Your Honor, that just by reading Lutheran heritage itself, you see that the Board there in 2004 approved work rules that ensure a civil and decent workplace, exactly the questions you have before you today. The Lutheran heritage majority found that work rules are necessarily general in nature and typically drafted by and for laymen, not labor law experts. And it wasn't going to require the employer to catalog all the possible exceptions that would protect Section 7 rights. That's a far cry from what the Board did here. What the Board did here is flip Lutheran heritage on its head, and it's adopted the dissent reasoning in Lutheran heritage, that since labor matters are so-called heated affairs with intemperate language flying about, that civility rules violate Section 7. It even goes as far to suggest that T-Mobile has to put the relevant legal statutes in its employee policies, turning them into a quasi-legal treatise for laymen. Looking at T-Mobile's four policies and the Board's hyper-technical, flawed analysis, how did the Board commit error? Two principle ways. First, it disregarded the plain language of the four policies, their common sense meaning, ignoring the fact that they don't regulate the content of the speech. They regulate the manner in which employees interact with each other, managers, and customers. Second... I understand that you had a lot of policies, or a number of them, that you conceded were somehow violative of the National Labor Relations Act, and these are the ones that survived. So I mean, what were the ones, what is the contrast between the ones that survived and the ones that you conceded and have not appealed? Your Honor, there are 11 other policies, and we did not appeal them because we believed on balance that these four policies were the policies that were, really, it was absurd for the Board to strike them down, and now the Union and the Board are trying to bring those other policies back in to this case. That's dirty pool, and it's dirty pool for two reasons. Let me tell you why. First, it assumes the policies all interrelate. There are three separate documents here. There's a code of conduct, there's an employee handbook, there's a computer and information security policy. They don't all interrelate. No employee, reasonable employee, is going to sit there and thumb through and compare policies. Only the Board lawyers and the Union lawyers are going to do that. But as I understand it, I mean, we're talking about these are stand-alone policies. Yes, Your Honor. They're not in the context of, they're not judged in the context of any Union campaign. There is no anti-Union animus on the part of the employer at all as far as this appeal is concerned, or otherwise, I don't know. That's right, Your Honor. As far as the record is concerned. It's a hypothetical question. And so it's, and so what we're taking is that if the Union came in, and if the company applied this policy to Union activity, that it would be violative of Section 7 rights. I can fully understand that. What I can't understand is how this neutral language with no context violates Title 7 any more than it violates, I mean, Section 7, any more than it violates Title 7. Exactly. In other words, you apply this same language to anything that, any kind of government regulation in which some expression of an opinion is violation of the law. I mean, you've got to put context in it. Context is critical, Your Honor, and I'm going to turn to the policies in a second, and we'll go through the context, but let me just say, this Court's already addressed this question in Arkema, and it recognized the danger of the could problem that's inherent in Lutheran heritage, and it said, the Board is making a big deal about what could happen. Well, could is such a broad word, anything could happen, I guess, but would is the standard. And here, the Board just deviated from its own standard. It used could instead of would in analyzing these policies. And if I could ask the Court to please turn with me to the record excerpts, that the Petitioner's record excerpts, to look at the policies themselves, there's two civility policies. The Workplace Conduct Policy, which is on page 12 of the, of tab number 3, the numbers are at the bottom right for your convenience. T-Mobile has a compelling, legitimate business interest in having employees speak and behave in a professional and civil manner. The D.C. Circuit recognized this in the Ad Rans case. It already addressed the Board's position and rejected it, that forbids an employer from promulgating a broad, prophylactic civil policy that, to maintain a civil and decent workplace. What the D.C. Circuit said was, that's, the Board's position is simply preposterous, quote, unquote. How about the, the, the word, the term, arguing? What would you, what does that mean? Sure. I mean, we are, I think that's what we have, oral argument here. Is this inappropriate? That we should not have oral argument? I mean, some of my colleagues might think that's not a bad idea, but. How far do we go with the word argue? Your policy says employees should not argue with each other. Well, I mean, how far do we go with that term? That's, Your Honor, Judge Prado, that's a great question. If you look at page nine, that's the conducting business, the code of conduct policy in the excerpts, it says, it gives a lot of context to what this no arguing and fighting with co-workers, subordinates, or supervisors, failing to treat others with respect, or failing to demonstrate appropriate teamwork means. It's under a commitment to integrity section, and it says, we expect employees to exercise integrity, common sense, good judgment, and act in a professional manner. While we can't anticipate every situation, the acts below are unacceptable. There's 17 items listed. Number 14 is the one that has the no arguing or fighting. It's clearly embedded in a rule with a lawful purpose bearing no relationship to section seven. The natural reading of that, Judge Prado, is that there's no verbal fisticuffs, there's no physical fisticuffs, that in light of T-Mobile's policies here, our goal is to have a civil workplace, no harassment, no discrimination, no troublesome employment complaints. We're not only subject to... Then wouldn't it be covered then with those terms and not have to use the word argue? I mean, can we maybe leave out the word argue and say it's covered with these other terms? When put in context, Your Honor, I think that argument here, argue or fighting, it's clear that this is part of a laundry list of really the seven deadly sins, right, of things not to do in the workplace, sleeping during work hours, dishonesty, fraud, theft, criminal conduct. They're all in the list of 17. An employee, a reasonable employee, would read this and understand that this is not the kind of disagreement that you and your law clerks or your panel members might have discussing a case or in a workplace discussing union matters. There's no evidence in the record that T-Mobile ever discriminated against anyone for a union activity or prohibited anyone from exercising their section seven rights. Again, this is a hypothetical could, not would. Why did you have to get so specific? I mean, why can't you just say we expect people to conduct themselves civilly, to respect each other, and not to engage in inappropriate conduct with each other or something of that nature? I mean, why have you got to go and name 50 different acts? Your Honor, traditionally, this is the way employers have written policies. I know, but that doesn't make it, I'm, why, why? Well, these are written for laymen, they're written by laymen, they're written to give as much guidance as possible to the employee who is reading it, or when a situation arises, to give guidance to the supervisors and managers or the human resources people, who are not lawyers in the company, to know how to apply them under the facts, so you want to be specific enough. So you assume nobody has common sense? No. No employee has common sense. No, Your Honor. You've got to spell it out exactly what civil conduct is, and then you wind up litigating it. Well, we're litigating because the board has ... All we've done seems like there are too many lawyers involved in writing those rules. Your Honor, we didn't write a no disagreements policy here, that's what the board is interpreting this as. There's nothing about wages, there's nothing about personnel issues here that's being discussed. It doesn't say don't argue about section seven topics. And the tired old rationale that the board puts out to support this is that these are labor matters are always have to be heated affairs with intemperate language. The D.C. circuit just rejected that out of hand in advance. They said that working men and women, they can discuss these things in a civilized way. I don't think that's probably true. I mean, not always, because union activity is both pro and con, is a very heated affair, usually. It is. I've witnessed a little of that. It is. Well, it can be, but there's no evidence here that, Judge King, that there was anyone impacted or harmed by these policies. Well, the question, then, I guess we have to decide is whether it's reasonable for an employee to interpret arguing to prohibit strong disagreements with co-workers about labor issues. Isn't that what we have to look at? Yes, Your Honor, in the context of all of the rest of that policy. I'd like to turn to the no recordings rule, if I may, which is at tab three of the selected excerpts, page 15. Two key points about that. First, the board's, it's a newly minted Section 7 right that they've proclaimed to record in the workplace. It's just another unexplained NLRB jurisprudential flip-flop, not entitled to your de novo deference. From the 1970s all the way to 2015, in the Flagstaff case, it was clear no recording was not protected under Section 7. It's provided no reason, justification to deviate from the Penn Telethon or the Bartlett case where they said that surreptitious recording in the workplace actually undermines Section 7 rights. That's why you have to give context to these things, because recording an employee distilling in the course of a union campaign for recording wages that were posted on the bulletin board, you did, if you took any kind of conduct against him, that, in my view, would be clearly in violation of Title 7. So a recording can be the basis for a violation. Well, I agree with you that it would be under those circumstances a violation of Section 7, and, but that's not the facts here. The valid does not... It is your argument, because your argument is that there is no Title 7, no Section 7 right to record. And I'm saying there may be. Well, even if there is, and we don't concede that there is, the valid purposes for this rule are baked into it. No Title, Section 7 violation for an employee to record wage information that was posted on the bulletin board during the course of a union campaign in which he was taken back to the union to show what the wages were. That's not a violation of Title 7, of Section 7? Your Honor, the Board has arbitrarily reached that result in its Rio case and its Whole Food case, which is up in the Second Circuit right now on appeal. But if you look at the purposes of the no recording rule, you'll see that it applies only to people or confidential information in the workplace and is limited to preventing harassment, maintaining privacy, encouraging open communications, and protecting confidential information, which is exactly, they're exactly baked right into the rule. Any reasonable employee would construe the policy to be limited to those parameters. The last policy, Your Honors, is... Okay, Mr. Salvatore, I believe you have a red light and you've saved five minutes for rebuttal. Thank you. Mr. Weitz, Weitz, is it? Weitz, for the National Labor Relations Committee. Good morning. May it please the Court. Eric Weitz on behalf of the NLRB. I'd like to begin just by sort of emphasizing what's actually at issue in this case. This isn't a referendum on the employer's ability to promulgate prophylactic rules that prohibit harassment or unlawful sharing of customer data or even a referendum on these particular rules. The only issue before the Court is whether this specific wording is permissible or whether the Board reasonably found that it's unlawfully ambiguous and unlawfully overbroad. And when the Court is making that determination, it also applies a deferential standard of review and owes some deference to the Board's determination in the first instance that employees... What we have to assume here is that the employer is promulgating rules that have no content, no specific intent to deprive anybody of any right under Section 7. And that we also have... And what I don't know because I don't know what the case law has been on Section 8C, the expression of any views, argument, or opinion or dissemination thereof, written, et cetera, et cetera, et cetera, shall not constitute or be evidence of an unfair labor practice unless such expression contains a threat. And none of these contain a threat outside the context of labor law or labor campaign and there's no labor campaign going on. That's correct, Your Honor. There's no threat and there's no... Okay. Well, how do we get around Section 8C of the National Labor Relations Act? Well, Your Honor, it's a well-established law that the mere maintenance of a rule is unlawful if it would chill employees in the exercise of their Section 7 rights. Going back to Republic Aviation, for example, a Supreme Court opinion, which involved a no solicitation rule. And in that case, the Supreme Court struck down the rule because there was no unlawful intent or there doesn't need to be unlawful intent. But if an employer enforces a rule which would chill employees in the exercise of their rights, that violates the literal language of Section 8A1, which prohibits restraining employees in the exercise of their rights. So it's well-established under this Court's precedent, going back decades, frequently with no solicitation rules. But this Court recently decided the FlexFrac case, which was a Section 8A1 rules case. So that is the law of the circuit that upheld Lutheran heritage as a correct governing standard. You still haven't answered my question, how that conforms with 8C. Well, because it's a violation of the literal language of Section 8A1 and the Supreme Court has held... But it says no expression of any views which all of these expressions... Correct. ...that is unlawful or shall be unlawful unless it contains a threat of reprisal. Correct, but Your Honor... There is no threat of reprisal here. That's correct, Your Honor, but these rules are not expressing an opinion. It's not analogous to First Amendment speech. This is more of a conduct-type speech where the employer is writing a rule which is saying you may not do this. It does not fall within Section 8C. If the employer were to provide their opinion on the union or something along those lines, that falls within Section 8C. But as the Supreme Court has recognized, for example, in the Gissel case, there are exceptions to just any employer's speech which nonetheless violate the Act. So is it the Board's position that a policy that says that employees must be respectful to each other is in violation of Section 7? No, Your Honor, and to answer that question and also perhaps to address some of Judge Jolly's concerns from the earlier argument, I would take issue with the notion that the Board prohibits civility in the workplace or respectful conduct in the workplace. If you look at the Lutheran Heritage case, which is the governing standard, that case endorsed the D.C. Circuit's ADTRANS decision, and the Board has endorsed elements of that decision in other cases, and the Board often upholds employer rules which prohibit certain types of disrespectful conduct. I think the William Beaumont case is a great case for the Court to look at, where the Board found that a few rules were unlawful, but it also upheld several rules which go to the type of interest that the employer is talking about here. For example, in that case, there is a rule which prohibited rude or condescending conduct. And the Board said that's perfectly fine to have that type of rule, because reasonable employees would not read that language and be confused as to whether it would apply to Section 7 activity. But if you just have a rule which talks about maintaining a positive work environment, it's unclear what that means, especially when it's a rule which expressly prohibits communications. It restricts communications. And as the employer points out in its own brief, there's a distinction between rules that prohibit conversations or communications and rules that prohibit or restrict behavior or even attitude. This is a rule which limits the ways in which employees can communicate with each other, can communicate with managers, and the only standard that employees have is this notion of a positive work environment. And as we point out in our brief, the Board has consistently found there's no flip-flopping when there's a change in the partisanship of the Board that rules which, for example, prohibit negative conversations or negativity are unlawful, because Section 7 activity is often, involves negative aspects. And the employer, you know, keeps emphasizing that the Board used the word heated in its decision, that these type of debates or discussions can become heated. That's not the Board's word. The Supreme Court of the United States has used that word, and the Supreme Court has Section 7. Somehow, in just an ordinary context, no union anywhere within 1,000 miles of a plant, and you have a rule that our employees should avoid all heated arguments. The government from Washington can come in and tell them, you can't say that. Now, that's just, to me, that borders on everything that I think the First Amendment doesn't stand for. Well, that's well taken, Your Honor, but the governing standard is whether reasonable employees would be chilled in their willingness to exercise Section 7 rights. It's no reasonable thing if they are 1,000 miles away from any union activity. There's no union activity going on anywhere. There's not a thought, and this is the record that you are dealing with, not a thought of any union activity going through the mind of any single employee. And the Labor Board can come in and tell the employee, you can't say that. And there's something terribly offensive with the way I've stated it. Now, you can tell me I'm just totally wrong about how I've stated it. Well, Your Honor, if I could perhaps try to explain why that's an important violation of the Act is because you need to have the grist on which concerted activity grinds, which is these preliminary types of discussions where, for example, employees get together and they have a grievance with a manager or with certain work rules, and they want to criticize what's going on in the workplace. And that is the precursor to any type of more formal union activity or formal protected concerted activity. And as the Supreme Court has recognized in the cases we cite in our brief, you need to have that kind of free and open communication because otherwise you can't get to the more concrete type of concerted activity. And so if an employer has a prophylactic rule in advance which says you cannot engage in negative communications, and it carries a threat of termination if someone violates that rule, then reasonable employees are going to read that, and they're going to read that as a threat of termination that they have a right under federal labor law to have. The regulation, I think, covers customers, clients, co-workers, and management. Correct. And the Board only found that the latter two are unlawful. So the Board's holding is specifically limited to restricting communications with co-workers or managers. So if the employer had just had a rule with the first two disjunctive terms, that presumably would have been lawful because, as we point out in our brief, the Board has often upheld rules which prohibit disrupting, for example, the employer's business or interfering with customers. Those are the types of rules that are lawful. But if you just have a vague, overbroad mandate that employees communicate with their co-workers or with managers to maintain a positive work environment, that's an ambiguous rule. As well as an overbroad rule which cautious employees are going to read to limit Section 7 activity. Wait a minute. Say that if you have an overbroad rule, it's in violation of Section 7. And if you have a narrow rule, it's in violation of Section 7. But if you have an overall rule that says employees should conduct themselves in a civil manner, are you telling me that is violative of Section 7? Well, the Board would have to adjudicate that. I'm not aware of any case which has used the word civil. Like I said, the Board has upheld rules which prohibit rude or condescending conduct. But the government comes in and says you cannot have a rule that says all employees in this company should conduct themselves in a civil manner with respect to management, employees, and everybody. That may well be lawful, Your Honor. I'm not aware of the Board having decided that. In each of these cases is a fact-specific case where the Board reads the entire policy. In this case, it's a policy that's, I believe, over 100 pages long. Many of the components, including harassment provisions, are not. That's what I'm saying. If they make it specific, it's in violation of Title 7. If they make it general, it's in violation of Title 7. Well, no, Your Honor. It's generally an overbroad rule which is unlawful. A narrow rule is only unlawful if the narrowness is targeted at actual protected activity. So, for example, a no solicitation rule can be a narrow restraint. But if you're prohibiting lawful solicitation, that's unlawful. And the mere maintenance of that rule is unlawful, as this Court has said in cases going back decades. So the question again, which under the Lutheran Heritage Standard, which the employer did not contest in this case, and I would submit is not really before the Court to second-guess, is whether a reasonable employee would be chilled in the exercise of their rights. And so turning to the specific rules in this case, I think, you know, granted the deference that this Court owes to the Board, the Court is not performing that analysis de novo. The Board, as a reasonable fact finder, was fully justified in finding that all four of these rules would be interpreted by a reasonable employee as applying at least in part to protected activity. And so the Board's findings is that this specific language is unlawful and the only remedy is that the employer has to revise the wording. It doesn't need to eliminate these types of policies or it's not prevented from drafting new rules to reach the goals that it talks about in its brief. So first, the workplace... I have a question about Lutheran Heritage. Was that, did that case arise out of a union activity or was it completely neutral on its face, neutral in its circumstances and everything, such as this one here? Well, the legal test is certainly in a neutral, a mere maintenance context. I don't know in that case if there was ancillary violations, but... You don't know whether Lutheran Heritage arose out of a union activity or not? Well, the violations in the standard that it set out... I ask you a question. Do you know whether it arose in the context of union activity? For the 801 violations, it did not. The standard in that case expressly applies in a non-union setting. I understand, but you've not answered my question yet. Did Lutheran Heritage, did that case arise out of a circumstance of union activity? Your Honor, I don't remember the facts of that case to know, but there are certainly many board cases which did not arise out of a union context. And in fact, this Court's FlexPract... is the lodestar here for your... Correct, but that's not really because of the facts of that case. It's because the board set out the framework in that case that it's applied in, innumerable cases afterwards, and the standard or the framework that this Court upheld in FlexPract, which is the law of the circuit, and the board has not changed this test. It has declined to do so in the William Beaumont case. So the standard remains this reasonable employee standard. In that, speaking of Lutheran Heritage, in the recording policy, it seems like the board used a balancing test, but I don't see the balancing test in Lutheran Heritage. Is there somehow the balancing test out of that case, or how did we get the balancing test? Your Honor, so the general Lutheran Heritage framework does not involve a balancing test, but the board has created, I guess, a subset of that test in the specific context of a recording ban or a recording policy because the board has recognized that there are situations where you have overriding employer interests, which would prohibit recording in the workplace. For example, in the Flagstaff case, if you have a hospital with patients all around, you have highly sensitive medical information, that's the type of environment where you could prohibit all recording because the risks outweigh the Section 7 rights. But in general, the Lutheran Heritage framework does not involve balancing, except in the context of the recording policy. So for three of the rules here, there's no balancing, but for the fourth rule, the recording ban, the board's position is that overriding employer interests can justify a recording ban. And that actually is a good transition to a point I wanted to make about the recording policy, which is basically the only argument that the employer has preserved and that's properly before the court is the argument that this is a total ban, but there are overriding interests justifying the breadth because, first of all, the board has submitted an outstanding motion to strike this argument that there's no Section 7 right to engage in recording. The employer did not raise that in its opening brief and it waived that argument. And secondly, this argument that employees would construe this, you know, based on the recitation of lawful purposes as not meaning what it says and not being a total ban on recording, that was not raised before the board. And so under Section 10e of the Act, it's not properly before the court. So the question there is whether the interests set out by the employer justify a total ban on recording persons discussions, a total ban on recording workplace discussions, a total ban on any kind of recording in the workplace. And as we point out in our brief... I gather that this doesn't cover T-Mobile store where you're showing someone how to use the phone and take pictures with your phone or use voicemail and record. Uh, I would... Yes, the... Phones today, you take pictures with your phone and you can record with the phone. Can you, in showing a client how the phone works, not be able to take pictures or make recordings? Well, Your Honor, I think it's unclear and that goes to how broad this rule is currently phrased. Um, it's not clear that there are any exceptions unless an employee specifically goes to a manager or the legal department and gets a formal exception. So the issue here is this rule is just overbroad. And as we point out in our brief, the employer raises a number of interests which are legitimate and might justify more limited bans, such as preventing harassment or protecting legitimate confidential customer data. The only issue here is whether the rule as currently phrased is lawful or whether it's overbroad. So the board's order does not prevent the employer from simply revising this policy to more narrowly target legitimate interests, which might include, you know, preventing, um... As a hypothetical, it might prevent recording in a room where there's a lot of customer financial data and where you wouldn't want to have photographs or other type of recording. But the rule as it stands is totally overbroad. It does not distinguish between work areas and non-work areas. It does not distinguish different types of employees. As we point out in our brief, the employer makes some arguments about how it's also in the service industry and its employees deal with customers. The employer didn't introduce any evidence of that. So you wouldn't have a problem with some sort of prohibition on recording so long as it was more restrictive? Yeah, that's exactly right, Your Honor. And that's what the board's test is here, where it does have this balancing element. If there's a recording ban which is justified by overriding employer interests, that's totally lawful. That was the case in Plague Staff,  because it prohibited taking photographs of patients or other areas in the hospital and also because that was justified by these overriding employer interests. So again, just to reiterate, the very narrow issue before the court is whether this specific language is overbroad or whether this specific language is somehow so necessary to the employer's interests that it justifies such an overbroad rule. And that's the very minor unfair labor practice that the board found with the remedy that the employer can simply revise the rules. The Lafayette Park Hotel case, how can that be distinguished? Isn't that what we have here, similar to what happened in Lafayette Park Hotel? Do you have a particular aspect? It prohibited employees from divulging hotel private information. I see. Well, I guess that would go... Not employees. ...the acceptable use policy with the disclosure of information. But as the board pointed out, there are lots of board decisions which have upheld rules, such as Lafayette Park, where there's information where it specifically refers to hotel private information or business documents or some type of information that employees would construe as only concerning, you know, that type of legitimate confidential information. But here you have a policy which just says any information and that the board has consistently found that that is overbroad because employees don't know what that means. For example, the Hyundai case, which was enforced by the D.C. Circuit, contained a similar prohibition. So I see that I'm out of time. If the Court has any further questions, we'd ask for full enforcement. Thank you. Thank you very much, Mr. Salvatore. I mean, Mr. Wright. Mr. Salvatore, you have saved some time for rebuttal. Thank you, Your Honor. Judge Stolle, to answer your question, Lutheran Heritage itself approved rules for...the board approved rules for a civil and decent workplace including rules against verbal abuse, abusive or profane language, or harassment. If you look at the William Beaumont dissent of Acting Chair Ms. Camara, he put a chart in there that shows the actual arbitrariness of the board's decisions with these micro, hyper-technical distinctions. The same policy language is in one case being upheld and in another case being found to be unlawful by the board. That's the height of... the epitome of arbitrariness. The reference to HC, Your Honor, is exactly right on. Taft-Hartley added the employer free speech proviso, and that is certainly something that the employer has the right here to do that. The board does not give advisory opinions nor does it allow any kind of general carve-out that says except for Section 7 rights. So we can't just tack that onto our policies. So employers are in this kind of guessing game, and that's the problem with Lutheran Heritage. You have the right as the court to look at the board's law at de novo and the substantial evidence test on its facts. And substantial evidence is more than speculation. It's more than theoretical conjecture. There has to be something here, and could as the court found in Arkema is not enough to make it over the bar there in terms of substantial evidence. The board raised the issue of waiver. I'd like to address that. Five quick points. With respect to the no recording rule, we raised Flagstaff in our opening brief at page 34. We raised Penn Telephone and Bartlett Collins at our opening brief at page 38. We pointedly attacked the board for recognizing a right to record when previous decisions had held the opposite. And the court's rule is that briefs are to be read liberally with respect to ascertaining the issues on appeal in the Fifth Circuit. So we'd ask that our arguments be heard in that regard. In terms of the repeated aspects that you had the exchange with the board lawyer a second ago, that comes when you look at Lutheran Heritage from member Liebman's dissent. And that now has become the majority that the T-Mobile board is applying without saying that they're flipping the law. I mean, that's as arbitrary and disingenuous as any agency could act. They're taking the case and flipping it on its head. No one was fired here. No one was hurt here. This is a hypothetical situation involving the analysis of these policies. The board itself says they should be analyzed under the Wood Standard. None of these policies mention wage or personnel information. FlexFrac, this court's other case beyond Arkema that dealt with these issues recognize that there's a big difference when you call out or call out personnel and wage information in a rule. You say the employees can't share that or the confidentiality policy covers that. That's not what we have here. We have these broad rules. They're broad. There's no doubt about it. They're broad because if you write them too specific, as Chairman Miscamara points out, you're liable to run into trouble with the NLRB. You write them broad and you try to instill in the workforce that we want to have a civil and decent work environment. T-Mobile's policies never mention wages or personnel information. The traditional subjects that are covered by Section 7 and you have to read the policies in context. It's very, very difficult to have the context of each policy be read, including the last policy which is the policy involving computer use. That's just absolutely crazy. This is a computer use policy. It talks about computer security, preventing hacking, preventing data breaches, preventing unauthorized people, unauthorized users. The whole policy applies to users with a capital U. It's like the policy the court probably has in connection with keeping your computers safe and the information in your computers safe. To strike down that policy is Your Honor, the epitome of arbitrariness and we'd ask that the Board's order all of them not be enforced with respect to these four policies. Thank you very much. Thank you, Mr. Salvatore.